UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
NEUROVIRTUAL USA, INC., : Docket No.
: **COMPLAINT**
Plaintiff,
:
-against-
:
MGC DIAGNOSTICS CORP.,
:
Defendant.
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff, Neurovirtual USA, Inc., by its attorneys, Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara & Wolf, LLP, as and for its complaint against defendant, MGC Diagnostics Corp., alleges the following:

### NATURE OF CASE

1. This is a case to recover money damages arising from defendant MGC's breach of a written exclusive distribution agreement under which it guaranteed to purchase a minimum number of units from Neurovirtual in 2015 and 2016.

2. After purchasing only two of the guaranteed minimum of 90 units in 2015, MGC recently announced its intention not to purchase any of the 115 units it is required to purchase in 2016.

3. Therefore, Neurovirtual is entitled to money damages as a result of MGC's breach of the written distribution agreement.

## PARTIES

4. Plaintiff Neurovirtual is a corporation organized under the laws of the State of Florida with a principal place of business located at 2315 NW 107th Avenue, Suite 1M273 Box 27, Doral, Florida 33172.

5. Upon information and belief, defendant MGC is a corporation organized under the laws of the State of Minnesota, with a principal place of business at 350 Oak Grove Parkway, St. Paul, Minnesota 55127. MGC's stock is publically traded on the NASDAQ under the symbol MGCD.

## JURISDICTION AND VENUE

6. This Court has original jurisdiction over this case pursuant to 28 U.S.C. § 1332(a) as the matter in controversy exceed the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different States.

7. Venue is proper in this District pursuant to Section 15.3 of the Distribution Agreement, which provides: "Each Party hereby irrevocably and unconditionally consents and agrees that all actions, suits or other proceedings arising under or in connection with the Agreement shall be tried and litigated in state or federal courts located in the Southern District of New York."

## FACTUAL BACKGROUND

*MGC Induces Neurovirtual to Enter Into a Distribution Agreement*

8. Neurovirtual manufactures a range of products intended to diagnose and treat sleep apnea. Its products include the Sleepvirtual BWII PSG, Sleepvirtual BWII PSG Plus, BW Mini HST and BW Analysis Sleep Software, together with parts and accessories for this products (collectively, the "Products").

9. MGC is a global medical technology company dedicated to cardiorespiratory health solutions. The company designs, markets and sells non-invasive cardiorespiratory diagnostic products through its Medical Graphics Corporation subsidiary under the MGC Diagnostics brand and trade name and through its MediSoft subsidiary under the MediSoft brand and trade name.

10. MGC's product portfolio provides solutions for disease detection, integrated care, and wellness across the cardiorespiratory healthcare spectrum. MGC sells its products internationally through distributors and in the United States through a direct sales force targeting specialists located in hospitals, university-based medical centers, medical clinics, physician offices, pharmaceutical companies, medical device manufacturers, and clinical research organizations. MGC operates in the research, development, manufacture and marketing of non-invasive cardiorespiratory diagnostic products.

11. In or about November 2013, Todd Austin, then the Executive Vice President – Global Marketing, Engineering and Corporate strategy for MGC (and now CEO), met with representatives of Neurovirtual to discuss a strategic partnership between MGC and Neurovirtual. According to Austin, MGC was interested in expanding its product offerings to include the diagnosis and treatment of sleep apnea to supplement its existing product line of cardiorespiratory products.

12. In a presentation to MGC's board of directors, Austin identified the sleep apnea diagnosis market as "a strategic adjacent CardioRespiratory market [which] . . . leverages existing MGCD sales channel and call points."

13. At the time of the meetings between Austin and Neurovirtual, plaintiff Neurovirtual had an exclusive distribution agreement with another company, Zynex

NeuroDiagnostics, Inc. Austin and Matthew Margolies, MGC's then Executive Vice President – Global Sales and Service (now president), represented to Neurovirtual that MGC had a bigger sales force and existing customer base than Zynex and was overall a more solid company. Austin and Margolies represented that MGC's existing cardiorespiratory products would allow for Neurovirtual to grow at a faster rate than with Zynex.

14. Based upon Austin and Margolies's representations, particularly regarding its sales force, customer base and opportunity for growth, Neurovirtual terminated its distribution agreement with Zynex.

15. MGC assisted Neurovirtual with the preparation of the termination notice and related termination agreement with Zynex.

16. On or about March 31, 2014, Neurovirtual entered into a new written distribution agreement with MGC as its distributor (the "Distribution Agreement"). Pursuant to the Agreement, MGC agreed to act as Neurovirtual's sole and exclusive distributor for the resale of the Products in five countries: United States, Canada, Japan, Australia, and Saudi Arabia (defined in the Agreement as the "Territory"). A copy of the Distribution Agreement is attached as Exhibit 1.

17. In a joint press release to announce the existence of the Distribution Agreement, Austin stated: "Our agreement with SleepVirtual is an example of how MGC Diagnostics continues to execute strategic partnerships with "best in class" providers of technology serving adjacent cardiorespiratory diagnostic markets. Together with SleepVirtual, MGC Diagnostics is well positioned to provide diagnostic capabilities to physicians managing complex patients, including patients with both COPD (chronic obstructive pulmonary disease) and OSA (obstructive sleep apnea). Leveraging MGC Diagnostic's global sales, marketing, and support

network provides our customers best-in-class access to cardiorespiratory healthcare professionals and their patients throughout the world."

18. As Neurovirtual's exclusive distributor in the Territory, MGC agreed to use its reasonable best efforts to promote and extend the sale of the Products throughout the Territory.

19. MGC also agreed to maintain an active and suitably trained sales force to sell the Products.

20. MGC further agreed to make reports to Neurovirtual relating to the sales, advertising, and returns of the Products.

21. Pursuant to the Distribution Agreement, MGC agreed to purchase the Products from Neurovirtual at designated prices for re-sale.

22. The Agreement obligated MGC to purchase a minimum number of units from Neurovirtual each year. The prices depended on the number of units sold. If MGC ordered 100 or fewer units of BWII PSG, the price was $7,250 per unit. For any unit sold about 100 units, the price was $6,740.

23. For the BWIII PSG Plus, the price was $11,990 per unit sold for the first 100 units and $10,990 for each additional unit sold.

24. In 2014, MGC was required to purchase a minimum of 70 units.

25. In 2015, MGC was required to purchase a minimum of 90 units.

26. In 2016, MGC was required to purchase a minimum of 115 units.

27. These minimum purchase requirements were a material part of the Distribution Agreement. Neurovirtual replied upon them to ensure that the company had an adequate income stream available to it.

28. The Distribution Agreement had a five-year term beginning on March 31, 2014. It could only be terminated by (i) mutual written consent of the parties or (ii) upon the occurrence of a material breach of the terms of the Agreement and the failure to cure that breach within 30 days after written notice from the non-breaching party.

29. The Agreement prohibits any oral amendment.

*MGC Ignores Multiple Sales Leads Provided by Neurovirtual*

30. Because Neurovirtual was prohibited from selling the Products in the Territory under the terms of the Distribution Agreement, it forwarded sales leads it received to MGC for them to pursue. In nearly every instance, MGC failed to do so.

31. For example, on May 1, 2014, approximately one month into the term of the Distribution Agreement, Neurovirtual forwarded to MGC an inquiry received from a 12-bed sleep center in Kentucky looking to replace its existing diagnostic equipment. MGC never pursued this lead.

32. On March 11, 2015, Neurovirtual sent another lead to MGC from a two bed lab in Hawaii that was looking to expand and purchase additional equipment. MGC never pursued that lead either.

33. On or about July 17, 2015, Neurovirtual sent MGC a lead from a hospital and nursing home in Colorado that was interested in establishing a sleep lab. Yet again, MGC never followed up on that lead.

34. In addition, Neurovirtual learned from other leads that they had contacted MGC about purchasing the Products, but MGC never responded.

### *MGC Fails to Honor Its Obligations Under the Distribution Agreement*

35. Frustrated by the lack of sales achieved by MGC, Neurovirtual requested a report from MGC on its sales forecasts and sales and advertising efforts.

36. After initially receiving no response, Austin apologized to Neurovirtual for not "responding to your mails" and explained that he had been "stretched thin" by MGC's efforts to acquire a company in Belgium.

37. At a meeting between representatives of Neurovirtual and MGC in Dusseldorf, Germany in November 2014, Austin assured Neurovirtual that MGC would honor its commitments under the Distribution Agreement and pressure the company's sales representatives to start selling the Products.

38. After seeing no progress, in January 2015, Neurovirtual again expressed its concerns to MGC about the lack of sales at a conference in Dubai. Margolies, by that time President of MGC, wrote in an email following that meeting to Neurovirtual that he "shared the same concern with you that my team was not giving the attention needed to be successful," but claimed to have "several ideas and a plan to run by" Neurovirtual intended to produce sales.

39. Margolies never provided any idea or plan to Neurovirtual that increased sales.

40. In July 2015, following more than six months without any sales, representatives of Neurovirtual met with MGC in Minnesota. Neurovirtual wanted to know if MGC remained committed to the agreement. And MGC assured Neurovirtual that it was.

41. MGC offered several theories for the lack of sales: lack of commitment of its current sales team, the lack of someone within MGC with direct oversight of the sleep apnea product line and an overall lack of lead generation by MGC's marketing group.

42. To address some of these issues, MGC hired a part-time salesman, Patrick Maquire, on a commission basis. However, MGC never provided him with any sales leads to pursue

43. MGC also claimed to be hiring a lead-generation company. According to Patrick Burns, MGC's Director of Product Management, MGC had "in the budget a lead generation company that is top notch." Upon information and belief, MGC's board of directors never approved the expenditure to hire the company.

44. In October 2015, Neurovirtual notified MGC that it had only purchased two units that year and therefore needed to purchase an additional 88 units by the end of the year to meet its contractual minimum of 90 units. A Senior Buyer for MGC, Ron Zinniel notified Neurovirtual that he had "been instructed not to place a purchase order" with Neurovirtual while MGC's executive team was discussing the 2015 minimum purchase requirement with Neurovirtual.

45. Except, there were no conversations taking place. Neurovirtual was the only side talking, and it repeatedly asked MGC for its sales plan. On October 20, 2015, Neurovirtual requested MGC's "expected forecast of your fourth quarter purchase orders."

46. Despite numerous promises, MGC never provided one. Over the next several weeks, MGC scheduled and then cancelled several phone calls with Neurovirtual.

47. MGC purchased only 2 units from Neurovirtual in 2015.

48. MGC's failure to purchase the contractual minimum of 90 units in 2015 forced Neurovirtual to obtain bank loans to make up for the lost income at considerable cost and lay off employees, and has deprived Neurovirtual of vital market share in the sleep-diagnosis industry.

*MGC Claims to Rescind the Distribution Agreement*

49. After failing to provide Neurovirtual with its sales plan, on December 17, 2015, MGC sent a letter to Neurovirtual purporting to rescind the Distribution Agreement "effective immediately," claiming Neurovirtual overstated the expected number of sales that would be handed over from Neurovirtual's prior distributor during their pre-negotiation discussions and caused MGC to lose the sales of two units in December 2014.

50. This was the first notification Neurovirtual received from MGC about any concerns it had with the execution or performance of the Distribution Agreement. In all other communications between the two companies, MGC conceded that the lack of sales was attributed to its own failures – and had nothing to do with Neurovirtual.

51. MGC's attempt at rescission was clearly posturing and intended to distract from MGC's admitted failure to devote adequate resources to the sale and distribution of Products.

52. The reality is that the Distribution Agreement does not contain any representations from Neurovirtual regarding the likely success of any sales leads, and any such representations that may have been made before execution of the Agreement, if any, are unenforceable because they are not contained in the Agreement.

53. In a recent report to investors and the public, MGC offered a new explanation for its attempt to rescind the Distribution Agreement. MGC claimed that the Distribution Agreement "violates specific statutory requirements that are unrelated to product safety or performance" – but never identified the alleged statutory requirements the Agreement purportedly violated.

54. Based on MGC's December 17 letter and public announcement, it is clear that it has no intention of honoring its commitment to purchase at least 115 units in 2016.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Contract)

55. Neurovirtual repeats and re-alleges each of the foregoing allegations as if fully set forth hereat.

56. The written Distribution Agreement constitutes a valid and binding contract between Neurovirtual, as supplier, and MGC, as distributor.

57. The Agreement requires MGC to purchase a guaranteed minimum number of units in 2015 and 2016 at specified prices.

58. Neurovirtual complied with all of its obligations required by the Distribution Agreement.

59. MGC breached the Agreement by, among other things, failing to achieve the minimum sales requirements for 2015 and 2016.

60. As a direct result of MGC's breach of the Distribution Agreement, Neurovirtual has been damaged in an amount to be determined at trial but in no event less than $1,055,120.00, plus interest.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Anticipatory Breach of Contract)

61. Neurovirtual repeats and re-alleges each of the foregoing allegations as if fully set forth hereat.

62. The written Distribution Agreement constitutes a valid and binding contract between Neurovirtual, as supplier, and MGC, as distributor.

63. The Agreement requires MGC to purchase a guaranteed minimum number of units in 2015 and 2016 at specified prices.

64. Neurovirtual complied with all of its obligations required by the Distribution Agreement.

65. By letter dated December 17, 2015, MGC claimed to rescind the Distribution Agreement effective immediately.

66. MGC's purported rescission of the Agreement constitutes the anticipatory repudiation of its obligation to purchase at least 115 units from Neurovirtual in 2016.

67. MGC's wrongful repudiation of its obligation to purchase at least 115 units in 2016 was unequivocal, definite and final.

68. As a result of MGC's repudiation of the Distribution Agreement, Neurovirtual has been damaged in an amount to be determined at trial but in no event less than $1,363,850.00 plus interest.

### AS AND FOR A THIRD CAUSE OF ACTION
### (Fraud in the Inducement)

69. Neurovirtual repeats and re-alleges each of the foregoing allegations as if fully set forth hereat.

70. MGC made repeated material representations to Neurovirtual regarding the size and capabilities of its sales force, commitment to selling sleep-diagnosis equipment, and existing customer base in order to induce Neurovirtual to terminate its distribution agreement with Zynex and enter into a new exclusive distribution agreement with MGC.

71. MGC made these material representations knowing them to be false and with the intention that Neurovirtual would rely upon them.

72. Neurovirtual did in fact rely upon MGC's material misrepresentations and terminated its agreement with Zynex and entered into the Distribution Agreement.

73. Had Neurovirtual known that MGC would not purchase the guaranteed minimum number of units as required by the Distribution Agreement, Neurovirtual would not have terminated its agreement with Zynex or executed the Distribution Agreement.

74. As a direct result of MGC's material misrepresentations, Neurovirtual has been damaged in an amount to be proven at trial but in no event less than $5,000,000 plus interest.

WHEREFORE, plaintiff, Neurovirtual USA, Inc. respectfully requests a judgment against defendant, MGC Diagnostics Corp., awarding money damages in an amount to be determined at trial but in no event less than $7,418,970.00 along with whatever additional relief the Court deems just, proper, and equitable, including costs of court and counsel fees.

Dated: January 12, 2016

ABRAMS, FENSTERMAN, FENSTERMAN,
EISMAN, FORMATO, FERRARA & WOLF, LLP

By: _____
Matthew F. Didora
1111 Marcus Avenue, Suite 107
Lake Success, New York 11042
(516) 328-2300
mdidora@abramslaw.com

*Attorneys for Plaintiff*